Good afternoon. Steve Brower for Screen Actors Guild. Not afternoon yet. We haven't been here that long. Sorry. But we've been here that long. You're doing all the work and I still feel like it's been time. I would like to reserve five minutes depending, of course, on how questions go with the panel. All right. I'm going to do something which I think is maybe unusual for the policyholder, but it's what we think is our case here. And that is to say that I want us to read the words of the policy, not make up new words. Read the words of the judgment. Read the words of the settlement. And even read the words of Health Net, which I think when we read them becomes irrelevant. But I'm going to start with the policy and give you what I hope is a short, simple, real hypothetical that explains the whole case and summarizes our position. Assume that Mr. Osmond had filed the exact complaint he filed, but did not include the request for payment out of the monies. Because after all, as we know, Screen Actors Guild was already paying it, did pay a million before the case ever settled. But I'm just saying, let's take a hypothetical. It would have been a clearly covered claim, unlike Health Net. Because in Health Net, they had a policy that was the standard insurance policy that you have all seen, argued, and had opinions on, where you have to have covered damages potential to have defense potential. As Federal has conceded here, this policy does not require that. This policy covers non-monetary claims. So, had Mr. Osmond filed this exact complaint without talking about the money, said, you don't advertise enough, you're not honest enough, you need to do audits, you need to do clarification, you need to do all the things that the final judgment said had to be done. It would have been covered for defense. And, which were paid. This is not an issue here. Everyone agrees this is a covered defense case. And then, if Judge West had looked at it, and if you look at the judgment, and by the way, look at the settlement, the first five pages don't talk about the money. The first five pages say you're going to do an audit. You're going to do annual checkups. You're going to do advertising on your website. You're going to do advertising in the newspaper. The last page says, and you're going to keep paying out money as you have been, and I'll get to that in a minute. But I'm saying. Okay, let me just. That's the second time you've said you're going to keep paying out money. Maybe I've read the record wrong. I was just looking. This is a huge win for Mr. Osmond. His position was your client had $8 million at least, which they hadn't been paying out. They had paid $250,000, I believe, over a period of eight years. And at first they said, we don't have to give you any of that money, of those foreign levies. And then they said, well, we wanted to give you the money, but gosh, we just couldn't get our computer situation worked out. It took us nine years to do that. So he brings this lawsuit, and the upshot of the lawsuit is your client has to cough up the money, 90% of it over three years. They're much more transparent. And so I don't understand an argument that says that they didn't get any money out of this. They did, a considerable amount, which your client was unwilling to give them before the litigation took place. No, they didn't get a penny. And that's because you have to look at the actual settlement, Your Honor, the actual judgment. The settlement specifically provides that no class member had a right to receive one penny. That's what the judgment says. And that's at distribution, excuse me, that's at appellants, our excerpts of record, 111 line 16 is where you'll find that. So your position is that your client did not have to start disgorging these foreign levies at all? They could just continue to keep them? No, no. Our client had been. Our client paid $8 million before the settlement was entered. The first major payment, Your Honor has part of the facts right, but let me point out to you. If you look at page 87 of our. The half-truth? No, I would never accuse any judge of a half-truth. Well, we have a fiduciary relationship, so. And I apologize if I misstated. Let me try again. If you look at page 87, it shows the history of distributions. There's page 87 of our excerpts, has the history of distributions. The first major distribution was three days after this case was filed. And that's because they had action working on this computer system, and they continued. Here's the trouble. Osmond argued, and if you look at the actual papers, I say look at the actual. I'm not talking about the theoretical. Are you assuming we haven't looked at them? Oh, no, no, no. I'm sorry. What I mean is taken in more detail, they show the following. SAG, by the way, first of all, this is one of those no-good degos unpunished. The producers had been taking 100% of the money. SAG, at its own expense, starting in 1989, said, wait a minute. Our members should be getting some of the money from the foreign royalties, because the producers were getting all of it, and negotiate to get 50%. And put those, by the way, always in segregated accounts, which is part of the record. SAG didn't actually have this money. This money was in, they were not escrow accounts in the sense that it was an escrow company, but they were segregated bank accounts. They never, this money was never in SAG's bank accounts. They were bank accounts SAG controlled, called money. SAG was actually working on this computer system.  I'll keep it. 15 seconds describe the problem. You get a thing from France saying, here's 8 cents for lassie number 13. They don't tell you who was in lassie number 13. They don't tell you who is the heir of the actress who played his aunt in lassie number 13. So all that is what goes through the computer system. That's why it took a lot of time. And why it still has aspirational goals, even in the settlement. But SAG was doing all that. SAG paid the first major payment three days after the lawsuit. It could not have sent out hundreds of thousands of checks three days after the lawsuit, before that was already happening. This lawsuit was probably prompted by the article in the SAG paper saying, we have this money and the computer system works, we're finally going to start sending it out. Their 8 point something million allegation complaint matches what the story said. By the way, we paid out $8 million before the settlement. A lot more since then. But the complaint was for $8 million? $8 million was paid before the case was settled. That's a coincidental match. But SAG always said we will pay for the benefit. However, the settlement says no member has a right. The settlement and judgment say no member gets a right here under. That's what the records say. Because, just because they're part of the class doesn't mean they were ever in lassie 13 or lassie 11 or France. It's aspirational because you'll notice it's not 36 months from the date. It's 36 months from when France finally gives us the darn paperwork we need to even know it was for lassie 13. Because a lot of the collecting agencies send us money and don't tell us why. They say, for U.S. DVDs, here's a million dollars. Now the producers don't care because they don't owe it to anyone. So they take their million and they put it in their pockets. SAG cared. Had to figure out where that million came from. Sends back the things saying, please send us paper. The settlement says 36 months from when they give you something, tell you who it might go to. May I ask you to interpret for me section E on page 109. It seems to say that SAG will pay out 90% of all foreign levy funds in its possession. What is that talking about, then, if you're saying they're not supposed to pay out anything? What's the purpose of that provision? Oh, very much. That is continued, consistent with SAG's already doing it. That is the aspirational payout. You'll notice that it goes down to the bottom of that paragraph, Your Honor. And it says, and if you can't, tell your board, tell your people, tell opposing counsel. And if opposing counsel would like your counsel to sit down on a meeting, your counsel has to sit down on a meeting to talk about what the problems are. But isn't this an obligation to make payments? It's an obligation to continue making payments to the amount available, but that's irrelevant to the coverage of the issue we're talking about, but yes. Okay, if it's irrelevant, then let's talk about the issue. Yes. Okay, so the issue is whether or not the insurance covered the attorney's fees. Yes. To the point. That's exactly the issue, Your Honor. Okay, so why don't we talk about that, then? And that's exactly what I wanted to get to.  Because we all agree there were other things. Audit, advertising, et cetera. That's not a dispute. That's well in there. If they'd sued for that, we would have had to respond. We would have settled. Those were the things they won on, by the way. They won on audit. They won on advertising. We did audit. We did advertising. That wasn't a preexisting thing. Okay, so we've agreed those are not at issue. But those are what triggered the covered claim. Because 1021, what we have here, just so you understand, is a very odd statute. Not odd policy, odd statute. 1021.5, the California law under which this was awarded, was an attorney general type statute. It says, if you do a broad public benefit, and by the way, these words, which were quoted in Federal's brief, are very important, pecuniary or non-pecuniary. Then the court, in its discretion, can give fees. Subsection B, if you're a county suing another county, you can get fees. This statute is so odd that subsection B involves counties suing each other. We're not talking about that. Judge West, if he'd been handed the exact settlement we have here without that paragraph about the money, audit, advertising, whatever, could have well said, I find you've done a non-pecuniary benefit to a broad group of people. And I hereby award attorney's fees. So what I'm saying is, that would have been 100% down the road covered. Why? Because under the Federal policy, that's why I say, I'm sticking with the words of the policy. I'm not doing any interpretation. The policy says if there's a money amount in a settlement or judgment, that alone, money amount in a settlement or judgment, is loss. Now there's exceptions for not. Can you tell me again how you distinguish Health Net? Sure. Health Net was a case, and Justice Kroski recently departed, you probably all know, was the author of the insurance book by Rutter. Justice Kroski was not weak on that issue. What he wrote in the opening paragraph, which I quoted in my brief, is, the search here is whether or not there are covered damages. You see, in Health Net, the problem he had was, A, you're a bad actor. I do like to distinguish myself from a bad actor, but that's not relevant. Especially when you're representing the screen actors here. Yes, well, and we know they're never a bad actor. I may be, they're not. They wish me to break a leg, but I guess that's the tradition. Health Net paid out a ton of money penalties, a ton of money triple damages. They paid out $77 million costs. They received not one penny from the insurance company for defense costs. Because the search there was find covered damages, potentially. We don't need to find covered damages, because ours covers non-pecuniary. Our policy is so different that covered damages is an irrelevant concept. 90% of all the insurance policies your Honor see, the policy says, we cover damages that arise from blah, blah, blah, blah, and one to get a defense burden. Well, doesn't there have to be a wrongful act? There has to be a wrongful act, too. So how does that relate to this case? Doesn't SAG already have a pre-existing duty to pay these funds? These funds were supposed to be destined for the members. These funds we're not trying to get coverage for. That's the other reason we're not a bad actor. We're not trying to get coverage for the funds, because they were never ours, in our opinion. And the fact that we're paying them is irrelevant. We're not asking for one penny out of the funds. We're not asking for a penny out of the advertising that we're paying for. We're not asking for a penny for the audit. Why? Because the exception to loss that they pointed to, sub 2, and that's why I say read the words of the policy, not the interpretation they give, but the actual words, says costs incurred for the purpose of complying with non-monetary damages. Meaning we don't get the advertising costs. They're not insuring that. They're defending that, but they're not insuring that. But they are, an attorney's fees award is not a, read the words, is not a cost of complying with non-monetary things. In fact, here's an important point before Mr., for opposing counsel makes a point. Don't confuse the word cost in that context with costs in the court sense. Why? Because do you think when they say we don't cover costs for non-monetary, they mean we do cover attorney's fees for non-monetary, or we do cover damages for non-monetary. No, if there were non-monetary damages incurred, they're saying the cost of doing those things. They're not talking about court costs. Maybe I'm missing some of their arguments. Yeah. I thought the center of their argument was, it had two parts, but the first part was that you can't get an attorney, you can't recover your attorney's fees unless there is a loss to anchor those attorney's fees upon, and you've suffered no loss under the terms of the policy, and therefore you can't get attorney's fees repaid under the terms of their policy because there wasn't a loss. And then their second argument is that you had a preexisting legal duty to cough up these foreign levies, and you can't get attorney's fees for doing what you were legally obligated to do. That's what they say, and that is completely wrong if you read the words of the policy. There is a loss, and that's the other reason why Health Net doesn't apply, and this is an important point, Judge Wynn and the panel. Health Net talked about you can't bootstrap attorney's fees. You may recall that term bootstrap because they use it. The reason it says that is because they never received a penny for defense costs. They had to show some covered monetary damages, which we don't need to show. So they were trying to, quote, bootstrap the attorney's fees and say, ah-ha, now we've got $100,000 worth of attorney's fees, pay us our $80 million of defense costs. That's not what we're saying. A, we've been paid our defense costs because we don't need a monetary loss. Non-monetary is included. But there has to be a covered loss. The attorney's fees are the covered loss. Okay. We understand your argument. Let's hear from the other side, and then we'll give you a minute for rebuttal. Thank you, Your Honor. I mean, I'm assuming you disagree that there was a covered loss. Yes. May it please the Court. Michael Nardi for Federal Insurance Company, the appellee. There was no covered loss. There was no loss because what SAG says is any amount that you have to pay under a judgment or settlement is loss. SAG is not reading the entire definition of loss, which says it's an amount that the insured becomes legally obligated to pay on account of a covered claim. And I think there's really no disagreement under Health Net and the cases that preceded it that a preexisting contractual obligation to pay these foreign levies is not a covered claim. In fact, under the federal policy, it's not a claim at all because proof of that obligation is not dependent on a wrongful act. It's based upon a preexisting contractual obligation. And Health Net says that is not actually under California law. It's not insurable. And so whether your policy covers damages or covers loss or covers whatever terminology the policy uses, if the obligation on account of which the attorney's fees are awarded is not insurable, is not a covered claim, then the attorney's fees awarded on account of that obligation are not loss. The other thing that... Your argument essentially is that the loss has to be tethered to a covered claim for a wrongful act, and so therefore any preexisting responsibility to pay out the foreign levy funds isn't covered. Exactly, and that's what the Health Net case holds. That was actually not a new holding in Health Net. Health Net was applying preexisting law. What Health Net adds to the analysis is the fact that an attorney's fees award is what I would consider a dependent claim. The attorney's fees award, coverage for the attorney's fees award, depends upon whether the obligation on which the attorney's fees are awarded is itself a covered claim. So if the underlying claim on which the attorney's fees are awarded is not a covered claim, then the attorney's fees awarded on account of that claim are not covered. That's what Health Net brings to the analysis, and in this case, obviously, the only two benefits... Now, this section 1021.5 that SAG references is the statute under which Osmond sought and recovered his attorney's fees. In order to recover attorney's fees, and the common law is the same for the enhancement payment, Mr. Osmond has to have succeeded in conferring a substantial benefit, either pecuniary or non-pecuniary, on a large class of persons. The only benefits that Mr. Osmond succeeded in conferring were the distribution of the foreign levies, which SAG agrees was a preexisting contractual obligation, and this non-monetary relief that counsel mentioned in his argument. The problem is that loss is an amount. Non-monetary relief is not loss. Also, loss does not include costs incurred to comply with an order for non-monetary relief or an agreement to provide non-monetary relief. So to the extent the attorney's fees and enhancement payment were awarded because Mr. Osmond conferred non-monetary relief on the class, that is not loss under the policy. So neither of the benefits that Mr. Osmond conferred succeeded in conferring, because the statute requires that he succeed. It's an attorney's fees clause. You have to have prevailed on some underlying aspect of your case which supports an attorney's fees award. The only things that he prevailed on were these non-covered or non-loss items. The other thing I want to mention is that – Let me just, before you get to that next one, because you'll remember yours and I might forget my question, and that is, so you're saying that the definition of loss and the triggering of coverage here require some kind of monetary damage to SAG, and because this was purely, I'll call it equitable relief or non-monetary relief, it fell outside the definition of a loss that was covered, and therefore you can't get attorney's fees for a situation where there was no loss. I guess I find that a little bit broad, so there could be no situation where the Screen Actors Guild did something which was so irreprehensible and they got sued for it, and as a result there was an order from the court telling them to stop this reprehensible behavior, but there was no damage award, just an order from the court. They would not be able to come to you and say we should be covered for our costs when there's a claim for attorney's fees. I'm not taking that broad of a position, Your Honor, because there are circumstances. If Mr. Osmond, remember Mr. Osmond alleged, he alleged, he didn't prove, he alleged a number of wrongful acts, misrepresentations, failure to disclose information, failure to account for information, failure to report on the foreign levies. If he had actually proven some of these things, and if they were the types of claims that would support an award of attorney's fees, then an amount that SAG became legally obligated to pay on account of these proven covered claims would be loss. But in this case, he didn't prove those things. In fact, there was no wrongful act proven at all. SAG insists in its brief, no wrongful conduct was proven by Mr. Osmond. They said, we always intended to distribute this money. I take issue with that, but I also take issue with the notion that the settlement doesn't require SAG to distribute the money, because I can cite testimony from SAG's Deputy Executive Director in which he describes the settlement agreement as requiring the distribution of this money. So I can tell you that's a supplemental excerpt to record pages 225, 233, and 234, where SAG's own Deputy Executive Director says, we didn't have an obligation before the settlement agreement, but now we're required to distribute it. If SAG collects the money, and they know who it belongs to, they have to give it to that person. They cannot keep it. They cannot use it for some other purpose. And if they can't figure out who gets the money, they have to distribute it to these charities that are related to the actors. There was some suggestion that, in the reply brief that I want to touch on, that because defense costs are a species of loss, that somehow mere allegations that aren't proven can support a finding of loss. And I want to address that, because it's important to know that this policy has two different ways under which Federal has to pay defense costs. There's defense costs as part of loss, but those are only defense costs that SAG would become legally obligated to pay on account of a covered claim, in which case Federal would reimburse those. A lot of DNO policies have this sort of reimbursement obligation, but without a traditional duty to defend. That is not how Federal paid SAG's defense costs. We did not pay defense costs as loss. There is a separate provision in the policy called defense and settlement. It's Section 10, and that is a traditional duty to defend provision, which extends the duty to defend to potentially covered claims. Even if the claims are groundless, false, or fraudulent, Federal will defend, and that's why Federal did defend. Right, so there's no dispute about that. Right, so the fact that defense costs also are a species of loss does not mean that mere allegations, unproven, will support a finding of loss. So these other allegations that Mr. Osmond made and didn't prove are not the basis for the Attorney's Fees Award, and are not a basis for finding loss. Of course, there's another reason that was not addressed by the District Court, which is the exclusion, Exclusion 5J2. I'm prepared to discuss that if the Court has any interest in discussing it. It's sort of an unresolved issue under California law. But we only reach the exclusion if SAG first proves that it falls under the insuring clause, and I don't believe that SAG has accomplished that. So if Your Honors have any questions, I'll answer them. Otherwise, I'll conclude my comments. It appears not. Thank you, Counsel. Thank you very much. Rebuttal. We'll give you one minute for rebuttal. Thank you, Your Honors. I'll be nice and brief and focus on two issues, because this is one of those frustrating circumstances where I'm so sure I'm correct, and I obviously have not done a good job. So let me focus on two things, Judge Winn and the panel. Excerpts of record, page 78. Federal admits that there were allegations of numerous wrongful acts under the policy. This is in the proposed findings of fact conclusion of law, and it reads, this is their response, undisputed that the Osmond action included allegations of wrongful acts under the federal policy. Now they dispute whether they're covered or not, and we can go to that, but I just want to be very clear. It is undisputed in their pleadings that there were wrongful acts alleged. What do you make of Counsel's point that there were wrongful acts alleged, failing to provide adequate public disclosures, illegally collecting foreign royalties funds, but SAG, as I understand it, took the position that virtually none of those allegations were proven as evidenced by the settlement agreement, and that's what Counsel's talking about. These are allegations that are unproven, so how do you respond to that? All the allegations are unproven. The judgment says that no one admits anything, so the money being owed is unproven. That is, the money being paid is agreed to, but it's unproven as being a wrongful act, so everything is unproven. So if everything's unproven, then all we're left with is a preexisting obligation to pay the foreign levy funds, which then seems to me to put it within the health net case. A preexisting obligation to do advertising that we agreed to do, a preexisting obligation to do audits we agreed to do. See, those are not preexisting obligations. No one admitted they were wrong, but SAG agreed to do a lot of things, which is why Judge West offered fees. Because I have very limited time, I'll just point out what I really would like the Court to do, and you already have, I don't mean to imply it. Look at page 172 of the Justice of the Record, and the whole case is found in paragraph 3 on that page, because paragraph 3 is the policy which says what they need to do, and you will see that unlike anything in the health net, the predicate is that monetary or non-monetary claims are sufficient, and that loss is paid if there is a claim, a lawsuit. That has wrongful acts. The inclusion of you need to advertise, you need to audit, you need to non-sheet, means any loss is covered, and loss includes money and settlement. We are not asking the attorneys to use this as an oddity. They are the only dollar amount. They are the covered loss. There is no covered loss. We don't want our audit money back. We agree it's not covered. We don't want our money back. Those fees are covered. Thank you to the Court for its time. Thank you. Thank you to both counsel. The case is argued and submitted.
judges: Ponsor, Rawlinson, Nguyen